# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 9, 2003 Session

## STATE OF TENNESSEE v. TERRANCE HEARD

### Direct Appeal from the Criminal Court for Shelby County
### No. 98-02267, 98-02268, 98-02270    Joseph B. Dailey, Judge

---

### No. W2001-02605-CCA-R3-CD  - Filed November 6, 2003

---

A Shelby County Grand Jury indicted the Defendant, Terrance Heard, along with fourteen other members of the "Gangster Disciples" street gang, for first degree premeditated murder, murder in the perpetration of a kidnapping, murder in the perpetration of a robbery, and especially aggravated kidnapping after two men were kidnapped and beaten by the gang, leaving one victim dead.  A Shelby County jury convicted the Defendant of first degree premeditated murder, murder in the perpetration of a kidnapping, and two counts of especially aggravated kidnapping, and the trial court merged the murder convictions, imposed a life sentence with the possibility of parole for the murder conviction and twenty-five years for each count of especially aggravated kidnapping, and ordered all the sentences to run consecutively.  The Defendant now appeals, contending the following: (1) that the trial court erred by denying the Defendant's motion to suppress the pre-trial identification of the Defendant made by a witness and by limiting cross-examination of the witness regarding this identification; (2) that the assistant district attorney improperly commented on the state of mind of the victim and a co-defendant during his opening statement to the prejudice of the Defendant; (3) that the trial court erred by allowing a witness to testify as to the victim's state of mind just prior to his murder concerning the Gangster Disciples; (4) that the trial court erred by denying the Defendant's request for a special jury instruction addressing the theories of duress and mere presence; and (5) that the evidence presented at trial was insufficient for a rational trier of fact to find the Defendant guilty beyond a reasonable doubt.  We find no reversible error and conclude that sufficient evidence exists in the record to support the Defendant's convictions.  Accordingly, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS., J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Terrance Heard.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Terry Harris, Assistant

District Attorney General; and Lorraine Craig, Assistant District Attorney General, for the appellee, State of Tennessee.

**Opinion**

**I. Facts**

This case arises from the kidnapping and murder of Marshall "Pokey" Shipp and the kidnapping and beating of Ricky "Kuboo" Aldridge by several members of the Gangster Disciples street gang on September 15, 1997. On February 24, 1998, the Shelby County Grand Jury indicted the Defendant, Terrance "Mohawk" Heard, and fourteen other co-defendants, all members of the Gangster Disciples, for first degree premeditated murder, murder in the perpetration of a kidnapping, murder in the perpetration of a robbery, and multiple counts of especially aggravated kidnapping for the crimes committed against the victims Shipp and Ricky Aldridge.

The Defendant was tried on August 6, 2001, in the Criminal Court of Shelby County for the following charges: (1) premeditated first degree murder of Shipp; (2) first degree murder of Shipp during the perpetration of a kidnapping; (3) especially aggravated kidnapping of Shipp; and (4) especially aggravated kidnapping of Ricky Aldridge. Following a five day trial, a Shelby County jury found the Defendant guilty of each charge, and the trial court merged the premeditated murder conviction with the felony-murder conviction, sentenced the Defendant to life imprisonment with the possibility of parole on the first degree murder conviction and twenty-five years for each count of especially aggravated kidnapping, and ordered the sentences to run consecutively. The Defendant now appeals.

**A. The Gangster Disciples**

Robert Walker testified for the State at the Defendant's trial regarding the Gangster Disciples organization in Memphis, including the gang's hierarchical structure, its rules, and its punishment for violations of the rules. In 1997, Walker held the position of chief of security for Memphis in the Gangster Disciples organization until he was arrested on two counts of aggravated robbery in the fall of that year. Walker later pled guilty to two counts of facilitation of robbery and agreed to cooperate with the State in this case. Walker testified that in 1996 he joined the Gangster Disciples in Memphis at the age of twenty-seven after he moved from Detroit, where he had been a member of the Black Gangster Disciples since the age of thirteen.

Walker explained that the Gangster Disciples organization is governed by a board of directors in Chicago, which appoints "overseers" in other cities. He stated that King Larry Hoover was the national leader of the Gangster Disciples. Walker testified that in 1997, the Memphis overseer was Tony "T-Money" Phillips, who had authority over all Gangster Disciple activity in the area. He stated that the overseer appointed two chiefs of security in Memphis to enforce gang rules. Walker stated that he was appointed "growth and development" chief of security, while Johnny "Jay Rock" Jefferson was appointed chief of security "enforcer." Walker testified that as "growth and development" chief of security, he was in charge of determining whether a gang member broke the

rules and investigating the facts of rule infractions, while Jefferson, as the "enforcer," would administer punishments to enforce the rules. Walker testified that each chief of security had two assistants.

Walker explained that Memphis was divided into several territories, which were each controlled by a governor appointed by the overseer. Walker stated that also under the overseer was an "auxiliary governor," who acted as a middle-man between the governors and the overseer. He further explained that under the "auxiliary governor" was a "floating regent," who had authority in any territory in Memphis. He stated that the governor of the South Memphis region, where these crimes occurred, was Corey "Tombstone" Mickens. Walker explained that each regional governor had an assistant governor and a regent. Walker stated that within each Memphis region, individual neighborhoods had coordinators and chiefs of security. He testified that the remaining Gangster Disciples were "outstanding members" with no authority.

Walker explained that the Gangster Disciples had their own rules and methods of enforcing those rules. He stated that the punishments for violating Gangster Disciple rules ranged from monetary fines to death. Walker testified that other forms of punishment included various degrees of beatings, such as a mouth shot, a three-minute beating, a six-minute beating, or a "pumpkin head deluxe," depending upon the severity of the violation. All of these beating punishments involved the use of fists only, no weapons. The "pumpkin head deluxe" involved putting the victim in a full nelson and allowing other members to beat his head for six minutes until his head was the size of a pumpkin. Walker explained that these beatings could be ordered by the overseer, the chiefs of security, the floating regent, the governors, or the neighborhood coordinators. Walker testified that the punishment of death was referred to as "eradication" in Gangster Disciple terminology and could only be ordered by the overseer. Walker stated that a governor may ask the overseer for permission to kill a member in his region, and if he receives permission, the governor may carry out the "eradication." He explained that death punishments were reserved for more serious violations of Gangster Disciple rules, such as shooting at other Gangster Disciples, not following orders, disrespecting an authority figure within the gang, and breaking "19/19," the code of silence, by talking with police or testifying.

Walker further explained that Gangster Disciples use different methods of killing in order to convey messages to other Gangster Disciples and deter them from violating gang rules. He testified that some of the symbolic methods of "eradication" included "[s]even times in the chest, one time up the butt, . . . cut your penis off." Walker explained that these symbolic methods were used:

> Just to let a person know, you know, he did this so if you do it, this is what's going to happen to you, you know. Shoot him up the butt and let everybody know, you know, he was disobedient to this organization. So he a punk in this organization. He a punk in his death. You know, cut his penis off, you know, he did something wrong, he told on this organization. So you tell on this organization, this what's going to happen to you.

Walker explained that death sentences were carried out in remote locations and that any Gangster Disciple, regardless of rank, may take part in the death sentence. He stated that outstanding members would often want to participate in "eradications" in order to impress higher ranking Gangster Disciples and advance in rank themselves. Walker also explained that an "OG," or "Original Gangster," was a Gangster Disciple member who had "been in it is so long he know everything about it just by–so it ain't no way for him to get out." He stated that the only way for an "Original Gangster" to get out of the Gangster Disciple organization was by death.

## B. Shipp and Ricky Aldridge's Violations of the Gangster Disciple Rules

Veronica Johnson, a Gangster Disciple member in 1997, testified that Shipp was an "Original Gangster" member of the Gangster Disciples because, at thirty-one years old, he was older than most Gangster Disciples. She explained that "it's an older crowd and it's a younger crowd. . . . The older crowd [is] level headed, they're level heads. The younger crowd is about robbing, stealing, killing, and beating people." Johnson testified that Shipp, as an "OG" Gangster Disciple, attempted to teach the younger Gangster Disciples and "tried to tell them right from wrong." Sharon Grafton, a childhood friend of Shipp, testified that she got reacquainted with Shipp in March of 1997 because she began dating Shipp's best friend, Patrick Owens. Grafton testified that she had a "social conversation" with Shipp about a month prior to his murder, and the Defendant's counsel immediately asked for a bench conference and objected to this testimony as hearsay. During the bench conference, the State argued that Grafton's testimony "clearly [went] to [Shipp's] state of mind," and defense counsel countered by arguing that there was not "a close enough nexus" between the statement and the incidents leading up to the murder. The trial court allowed the testimony, explaining:

> I think given the sort of regularity of these incidents, this statement made on one day, two weeks later one incident, a week after that a second incident, a week after he's killed. That is all, I think, very consistent with his state of mind and sort of underscores his overall frame of mind . . . ."

Following this ruling, Grafton testified that Shipp told her that "he was tired of the lifestyle and the environment that he was in" and that "[h]e wanted to get out" of the Gangster Disciples.

Johnson testified about an altercation between the Gangster Disciples and Shipp that occurred at the L & B Lounge during her birthday party on August 29, 1997, which was attended by some Gangster Disciples, including Shipp and his girlfriend, Cheryl Patrick. Patrick, a Gangster Disciple, was also Johnson's roommate and close friend. In addition to Gangster Disciples, Johnson stated that Devin Haywood, a mentally handicapped man whom "neighborhood people looked after all the time," also attended her birthday party.

Johnson testified that at some point during the evening, she saw Haywood on his knees in the middle of Third Street being held at gunpoint by nine or ten Gangster Disciple members. She stated that the Gangster Disciples started to beat Haywood with their guns. She reported that the

Defendant associated with several of the Gangster Disciples involved in the beating, though the Defendant was not present at this incident. Johnson testified that once Shipp saw Haywood getting severely beaten, Shipp ran out to the group of Gangster Disciples and attempted to push them off Haywood. Johnson stated that Christopher Smith, assistant governor of the Gangster Disciples of South Memphis, "told [Shipp] that he was interfering in GD business." Johnson testified that Shipp "kept telling them to get off [Haywood] and pushing them off of him." She stated that in response to Shipp's actions, Smith "told [Shipp] he just signed his death certificate." Johnson testified that once the group of Gangster Disciples surrounding Haywood dispersed, she knelt down beside Haywood and held his hand as they waited for the ambulance. Johnson explained, "[Haywood's] face was real swollen. His eye was like, you know, huge like it was going to burst or something." Johnson testified that she quit the Gangster Disciples, or "dropped her flag," in September of 1997.

Cheryl Patrick testified that she was living with her friend Veronica Johnson and dating Shipp in 1997. Patrick stated that on September 11, 1997, she and a friend walked to meet Shipp at the L & B Lounge. She reported that once they arrived at the lounge, she saw Shipp and Carlos Bean, another Gangster Disciple, arguing in front of the lounge. Patrick testified that "[Bean] was telling [Shipp] he wasn't GD no more and he had some guys that wanted to do him. . . ." She stated that Shipp replied, "Just go on," and then he crossed the street. Patrick testified that Bean followed Shipp across the street, and "[Bean] was just cussing, calling out his name, telling [Shipp] that he wasn't GD . . . and [saying,] 'I got some nigger that want to do you anyway.'" Patrick reported that Shipp did not respond to Bean except to tell him, "Go on Carlos. I don't want to hear that." She stated that Bean then shoved Shipp, and Shipp responded by grabbing Bean and pushing him away, telling him to "go on." Thereafter, Patrick testified that the altercation escalated and Bean and several others holding pool sticks surrounded Shipp. She stated that the Defendant was not present during this altercation. Patrick testified that Shipp's sister then pulled up in her car with Shipp's cousin Ricky Aldridge and another cousin, Marcus "Scutt" Aldridge. She reported that Ricky Aldridge got out of the car and began shooting into the air, which immediately dispersed the crowd.

Ricky Aldridge, Shipp's cousin, testified that he joined the Gangster Disciples while at the Shelby County Correctional Center in 1996 and continued his affiliation with the gang when he was released in March of 1997. Ricky Aldridge testified that in 1997, Shipp was not interacting with the younger members of the Gangster Disciples and did not attend gang meetings. He testified that on September 11, 1997, he was at his cousin's house a block away from the L & B Lounge when Shipp's sister came by the house and told him that "[Shipp] was into it with some guys up on the hill." Ricky Aldridge reported that he got in the car with Shipp's sister and his cousin Marcus Aldridge and drove up the hill to see what was going on at the lounge. Ricky Aldridge stated, "we made it up there and we seen some guys have [Shipp] surrounded. So I jumped out of the car and shot up in the air two times and broke the crowd up and everybody just scattered." He testified that after the crowd dispersed, he got back into the car and they drove away from the lounge. Ricky Aldridge stated that Shipp ran away from the scene after the shots were fired.

### C. Gangster Disciples' Punishment of Shipp and Ricky Aldridge

-5-

Following the two incidents at the L & B Lounge involving Shipp and Ricky Aldridge, Walker testified that various Gangster Disciple leaders discussed what should be done with Shipp and Ricky Aldridge regarding these violations of gang rules. Walker testified that following the incident at the L & B Lounge on August 29, 1997, Mickens, governor of South Memphis, visited Phillips, the overseer, at his residence to discuss Shipp. Walker stated that as chief of security, he was present during this meeting and heard Mickens tell Phillips that "he got a brother being rebellious, you know, and he asked [Phillips] what to do. [Phillips] told him to deal with it." Walker stated that Mickens returned to Phillips's residence after the September 11, 1997 incident in front of the L & B Lounge. Walker testified that Mickens again expressed concern over Shipp being a "rebellious brother." Walker reported that Phillips "asked [Mickens] why [Shipp] was still here, you know. He already told him to deal with it. So, you know, [Mickens] can do whatever he sees fit to do with it."

Walker stated that Mickens returned to Phillips's residence a third time on September 15, 1997, the date Shipp suffered the beating which led to his death. Walker testified that at this meeting, Phillips was upset with Mickens because Mickens had failed to take care of the "rebellious brother" Shipp. Walker stated that Phillips "asked [Mickens] why [Shipp was] still living. [Phillips] already gave [Mickens] the authority to do whatever he wanted to do. If this brother being rebellious, why is he still around?" Walker testified that Phillips received a phone call during this meeting with Mickens from a Gangster Disciple in South Memphis. Walker stated that he heard Phillips say "go ahead and kill him but hold up." Walker reported that Phillips looked at Mickens, and then Mickens got up and left to go to South Memphis, where the killing was to take place. Walker explained, "If [the execution is] carried out, you know, [Mickens] got to be there. He can either stop it or he can let it be carried out. You know, that's his land. He just got to approve it to do what he wanted to do." Also at this third meeting, Walker testified that Mickens and Phillips discussed whether to kill Shipp's cousins, Ricky Aldridge and Marcus Aldridge. Walker explained that they had planned on killing Shipp's cousins, but Mickens refused to approve the killings because he believed that they would not say anything to police.

Ricky Aldridge testified that after the incident on August 29, 1997, the Gangster Disciples of South Memphis held a meeting at Mickens's residence to discuss Shipp because he had "disrespect[ed] the assistant governor." Ricky Aldridge stated that Mickens asked him if knew about this particular incident, and he replied that he did not know anything about it. Ricky Aldridge testified that Mickens said "he was going to have to get a hold of [Shipp] and see what was going on." Ricky Aldridge further testified that on September 15, 1997, he walked to Mickens's apartment because Mickens wanted to talk with him. He stated that he met with Mickens, Matrin Becton, Carlos Bean, and another Gangster Disciple in the parking lot of the apartment complex. Ricky Aldridge testified that Mickens said, "I got a incident report on you from Third and Parkway that you were shooting at another gangster." Ricky Aldridge denied the incident and told him that he did not do it. He testified that Becton then told him that if he was found guilty of these charges, he could "be put in violation." Ricky Aldridge stated that Mickens told him that they would "get back with me later on. They [were] fixing to go catch up with [Shipp]." He testified that after talking with Mickens and the others, he "knew it could be some trouble so I called over [to] my cousin's house

trying to catch up with [Shipp]. I couldn't catch up with him." Ricky Aldridge testified that he then went to a friend's front porch and drank a beer as he waited.

Patrick testified that on September 15, 1997, Shipp drove his car to the L & B Lounge with Patrick and two of her friends, Samantha and "Wolf," as passengers. Patrick stated that when Shipp parked his car near the lounge, "[t]wo people was running to [Shipp's] car telling him that some niggers wanted to talk to him." She testified that when Shipp asked them where these individuals were located, they pointed across the street to a group of about fifteen people. Patrick stated that as Shipp walked across the street to the group of people, Matrin Becton, the regent for the South Memphis Gangster Disciples, told Shipp, "We need to holler at you for a minute about a small little incident that happened." Johnson stated that Shipp responded, "Like you need to holler at me about what? About what? About what?" She reported that Becton replied, "We can't talk right here. We need to go somewhere else and talk." Patrick stated that when Shipp objected and asked why they could not talk right there, another Gangster Disciple, Choncey Jones, stepped in and said, "Well, this is what we're going to do. You're going to ride in this car right here," pointing to Jones's 1998 burnt orange Oldsmobile. Patrick testified that Shipp responded, "I'm not fixing to ride in that car with you. I've got my own car. No, I'm not fixing to ride. You know, they was cussing and there was a lot of commotion."

She stated that Becton told Shipp to pick two people to ride with him in his car, and Shipp picked Becton and Matthew Dixon, another Gangster Disciple. Patrick stated that Jones told Dixon to ride with him, so Becton and another Gangster Disciple walked with Shipp, Patrick, and Patrick's friend over to Shipp's car. Patrick testified that she saw that Becton had a black automatic handgun tucked into the back of the waistband of his pants. She stated that they all got into Shipp's car, with Shipp in the driver's seat, Patrick in the front passenger seat, Becton behind the passenger seat, Patrick's friend Samantha in the middle, and the other Gangster Disciple behind Shipp. Patrick testified that once they got into the car, Becton reached in the back of his pants and put his gun in his lap. Patrick reported that as Shipp drove away from the L & B Lounge, he appeared to be scared. Patrick stated that Shipp drove to her home, and she and Samantha got out of the car. Thereafter, Patrick testified that Becton got into the front seat next to Shipp and then Shipp drove off. She stated that Jones's orange Oldsmobile was following Shipp's car. Patrick testified that she was concerned about Shipp "[b]ecause I didn't feel right. Then I had seen that gun. Then I'm like, all of these guys, I just didn't feel right. I had a funny feeling." She stated that because of her fears, she woke up Patrick Owens, Grafton's boyfriend and Shipp's best friend, who was sleeping at her residence when Shipp dropped them off. Patrick testified that Owens and Grafton left in Grafton's car to go look for Shipp.

Ricky Aldridge testified that he waited on his friend's porch "[f]or some hours" until four Gangster Disciples approached him in the early evening and told him that Mickens "needed to holler at me." Ricky Aldridge stated that at least one of the Gangster Disciples who approached him was carrying a gun under his shirt. He reported that he and his older brother, Timothy "Pill" Aldridge, left with the four men to go to Mickens's apartment. Ricky Aldridge testified that once they arrived at Mickens's apartment, he saw about twenty South Memphis Gangster Disciples sitting around and

talking in the living room, including Shipp, his cousin. He reported that several of the Gangster Disciples were carrying weapons such as automatic handguns and pistols. Ricky Aldridge testified that he walked into the room and "sat down in the corner on a bucket." He testified that Shipp was wearing a yellow shirt, a herringbone necklace, and a ring. Ricky Aldridge stated that he saw the Defendant at this Gangster Disciple meeting, though he did not know the Defendant personally that night. He testified that once he entered the room and sat down, the conversation changed:

> Well, somebody said, 'Let's get down to the business, folks,' and then jumped on–the conversation jumped to . . . talking about what kind of violation we should get. Some said everybody in the room voice their opinions and say something whether it was a three-minute violation or a six-minute violation. They was talking about what kind of violation they think we should get. And some said three-minute and some said six-minutes.

Ricky Aldridge testified that everyone in the room, including the Defendant, stated their opinions as to what his and Shipp's punishment should be. He stated that after these opinions were given, Mickens, Smith, and Becton started to discuss what should be done with him and Shipp. Ricky Aldridge reported that Mickens "said he knew me, he knew [Shipp], he wasn't going to show no favoritism. Since it happened on [Smith and Becton's] land, he going to let them handle it." Following this conversation, Ricky Aldridge stated that one of them said, "That's the business, folks . . . Let's roll," and then everybody in the room left Mickens's apartment. Ricky Aldridge stated that he and Shipp had to go with the other Gangster Disciples. He explained, "I [didn't] want to–I was in fear for my life. I didn't want to jeopardize my family. I didn't want to bring no heat to [their] house. That's why I went." Ricky Aldridge testified that the Gangster Disciples had determined that he was in violation of gang rules and should be punished. He stated that all the Gangster Disciples left Mickens's apartment except Mickens and a few others. Ricky Aldridge testified that he got into the back of the orange Oldsmobile with Jones, Dixon, and another Gangster Disciple. Ricky Aldridge stated that Shipp returned to his car along with Timothy Aldridge and some other Gangster Disciples, while other Gangster Disciples got into a black Ford F-150 pickup truck. He testified that the black pickup led the caravan, followed by Shipp's car and Jones's car. Timothy Aldridge testified that he drove Shipp's car after another Gangster Disciple ordered him to. Timothy Aldridge stated that the Defendant drove the black pickup while other Gangster Disciples rode in the cab and in the back of it.

Ricky Aldridge explained that while he and Shipp were in their respective cars, they were under "Gangster Disciple arrest" and were not allowed to leave the cars. He stated that the caravan pulled into an Amoco Station and everybody but Ricky Aldridge and Shipp exited the vehicles. Timothy Aldridge testified that Antonio "T-Murder" Sykes, a Gangster Disciple, "came to the back door where my cousin [Shipp] was sitting in the back seat and told him, 'Take off your jewelry,' . . . . My cousin [Shipp] took off his jewelry and handed it to him." Ricky Aldridge testified that Sykes approached the Oldsmobile he was riding in and "said he needed everything out of my pockets." He stated that he emptied his pockets of some money and handed it to Sykes, who placed the money into his pocket. Ricky Aldridge noticed that Sykes was wearing Shipp's herringbone

necklace and ring. Both Ricky Aldridge and Timothy Aldridge testified that the caravan of Gangster Disciples left the Amoco station and went to DeSoto Park in Memphis, with the black pickup driven by the Defendant leading the way.

Officer D.H. Rowe, a crime scene investigator of the Memphis Police Department, testified that he was assigned to investigate Shipp's murder. Officer Rowe stated that he inspected the crime scene at DeSoto Park on September 16, 1997, the day after the murder. He described the crime scene as an "Indian" mound overlooking the Mississippi River, and the State introduced several aerial photographs of the crime scene. He explained, "It's a very secluded location. The actual scene when you drive up is just a high mound from the street." Officer Rowe testified that the "Indian" mound had a large hollowed-out depression in the middle of it which gradually dropped eight to ten feet from the outer rim of the mound and contained a tree in the middle of this depression. Officer Rowe stated that the inside of the mound could not be seen from the street level because the outer rim of the mound concealed it. He also stated that he could not hear what people were saying on the inside of the mound when he was standing at the street level.

Ricky Aldridge testified that the three Gangster Disciple vehicles parked on the opposite side of the street from DeSoto Park. He stated that it was dark when they arrived, with "no light but a street light . . . wasn't nothing but the reflection of the moon shining." Once the vehicles parked, Ricky Aldridge testified that everybody got out and walked across the street to the park. Timothy Aldridge testified that once the group reached the "Indian" mound, "[w]e was lining up around the hill, the top of the hill and . . . one guy had my cousin [Shipp] by the back of his pants and one guy had my little brother [Ricky Aldridge] by the back of his pants." Ricky Aldridge stated that Dixon grabbed the back of his pants and walked him up the "Indian" mound and then down into the center of the mound. He stated that another Gangster Disciple was holding Shipp in a similar fashion as he walked Shipp into the center of the "Indian" mound. Ricky Aldridge stated that he stood right next to Shipp once they were in the center of the mound, and the rest of the Gangster Disciples, approximately fifteen, surrounded them. Ricky Aldridge stated that the Defendant was one of the Gangster Disciples who surrounded them. He testified that Jones came down into the mound holding some iron crowbars, baseball bats, and some other items. At that point, Ricky Aldridge stated that Shipp asked Becton, "'Can I holler at you, man?' And [Becton] said, 'Ain't nothing else to talk about. I'm fixing to take your G,'" which meant that he was going to end Shipp's membership in the Gangster Disciples. Ricky Aldridge testified that when he saw Jones carrying all those weapons down into the mound, "I seen my life. I thought I was fixing to die. I thought we was going to die."

Ricky Aldridge stated that they then told him to come out of the center of the mound. He stated that once he reached the rim of the mound, "then they started serving [Shipp] violation and he started fighting back. And that's when that big dude right there [the Defendant] grabbed him from behind." Ricky Aldridge stated that when Shipp started to fight back, the Defendant grabbed Shipp and held him as the other Gangster Disciples beat him. He testified that "[w]hen [the Defendant] grabbed [Shipp] somebody hit him with something and that's when he went down. And they was just beating him, beating him with them irons and bats and stuff. Just beating him." Ricky

Aldridge stated that the Gangster Disciples who were beating Shipp "act[ed] like they was enthused about it. . . . They was laughing." Timothy Aldridge stated that he did not want to beat either Shipp or his little brother, so he pretended like he was hitting Shipp after being pressured by Smith. Timothy Aldridge testified that he saw the Defendant beating Shipp and that the Defendant had "something" in his hand as he beat Shipp. Ricky Aldridge stated that it was hard to look at Shipp being beaten, so he would look for a minute and then put his head back down. He testified that after a few minutes of beating Shipp, the Gangster Disciples told Ricky Aldridge to "come in the circle." Once he got into the circle, Ricky Aldridge testified that "[t]hey started serving my violation." He stated that six Gangster Disciples beat him with fists only, no weapons. Ricky Aldridge testified that while he was getting beaten with fists, other Gangster Disciples continued to beat Shipp with tire irons and bats. Ricky Aldridge stated that his fists-only beating lasted six minutes and then stopped. After the beating ended, Ricky Aldridge testified that he saw Shipp laying under the tree in the middle of the "Indian" mound, and he thought Shipp was dead. He stated that Sykes then went up to Shipp, "ripped his clothes off of him, took his shoes off his feet, and then shot him." He explained that he did not actually witness Sykes shoot Shipp, but he heard the shot once he climbed down the mound. Ricky Aldridge stated that Timothy Aldridge helped him walk out of the mound towards Shipp's car. Timothy Aldridge testified that he drove Shipp's car away from the crime scene with Ricky Aldridge in the passenger seat and another Gangster Disciple, Joe Brown, in the back.

Ricky Aldridge testified that after the beating at DeSoto Park, he met with Patrick Owens, and Owens drove Grafton's car back to the park. Ricky Aldridge explained:

> We parked on the same side of the street the park on, went back in the mound, picked [Shipp] up and he was mumbling some words, so we picked him up. [Shipp] was trying to walk a little bit and then he fell as we were going up the hill. So I grabbed him from the back and [Owens] had his legs and we tote him over the hill and down the hill and put him on the back seat of the car.

He stated that Shipp was still alive but he looked "[b]ad. Beat up. . . . Wounds on his head, eyes and back of his head, blood all over." Ricky Aldridge testified that he was covered in Shipp's blood after carrying him to the car with Owens. Ricky Aldridge stated that once Owens drove to Patrick and Johnson's house, he ran away from car. Patrick testified that when Owens pulled up in the car with Shipp, "[Owens] was hollering and crying, 'Call–dial 9-1-1. He alive. I got Pokey. I got Marshall. He alive. He alive. . . .'" Patrick stated that Johnson called 9-1-1. She reported that Shipp did not respond to her when she tried to speak to him. Wilma Shipp, Shipp's mother, testified that she received several phone calls on the night of September 15, 1997 at around 11:30 P.M., and the female voices said, "Pokey is dead, Pokey is dead." Wilma Shipp stated that she and her daughter Kimberly Shipp started driving and looking for Shipp. She testified that she found her son in the back of a gray car in front of Patrick and Johnson's house. She stated that Shipp was "beat very badly. He was bloody and beat all in his head, all in his face, all in his arm, and on his leg." Wilma Shipp stated that every time she tried to talk to her son, he would moan and kick. She testified that the ambulance came and took Shipp to the hospital. She reported that she stayed with her son in the

hospital until he died on September 17, 1997, and that during those two days, he never regained consciousness.

Dr. Thomas Deering, Assistant Medical Examiner for the Shelby County Forensic Center, testified as an expert in forensic pathology at the Defendant's trial. Dr. Deering testified that he performed the autopsy of Shipp's body and found multiple lacerations over various places on the head, including the back of the head, the front, the ears, the mouth, and over the eyes. He stated that there was a gunshot wound in the left buttock and multiple lacerations and abrasions all over the body. Dr. Deering testified "that death was due to severe blunt trauma to the head with multiple skin lacerations and injury, swelling and bleeding of the brain. And this was aggravated by a gunshot wound to the pelvis with bleeding and blunt trauma to the lower legs."

Following the State's proof, the Defendant's counsel made a motion for judgment of acquittal, which the trial court denied. Thereafter, the Defendant testified in his own behalf. The Defendant testified that he joined the South Memphis Gangster Disciples in March of 1997 and quit the gang in September of that same year. He stated that when he joined the Gangster Disciples, he was an outstanding member and did not hold a position of rank. He explained that he joined the Lauderdale neighborhood Gangster Disciples and was not familiar with Gangster Disciples from other neighborhoods. The Defendant stated that he became aware of the September 11, 1997 incident between Shipp, Bean and Ricky Aldridge on September 15, 1997 at the afternoon meeting at Mickens's apartment. He testified that at the meeting at Mickens's apartment, Bean explained to the group what happened on September 11, 1997, and then Ricky Aldridge told his side of the story. The Defendant stated that Mickens decided that the Gangster Disciples should not decide anything until Shipp was present at the meeting. The Defendant testified that later that evening, at about 11:00 P.M., he received a call from Irvin Brooks, the coordinator for the Lauderdale neighborhood Gangster Disciples. The Defendant stated that "Irvin said that they had found [Shipp] and they were ready to get up with us." After receiving the call, the Defendant testified that "unfortunately" he found a ride to pick up Brooks and then they went to Mickens's apartment complex for the meeting about Shipp and Ricky Aldridge.

The Defendant stated that he did not attend the meeting at Mickens's apartment, rather he stayed outside the apartment complex. He testified that once the meeting adjourned, he got into the back of a black pickup truck with "a lot of people" and did not drive the pickup. The Defendant testified that he did not know either Shipp or Ricky Aldridge and did not speak to them that night. He explained that the caravan left Mickens's apartment complex, with the black truck in front, followed by the two cars. The Defendant stated that the Gangster Disciple caravan drove first to Carlos Bean's house, but when they could not find him, they went to an Amoco station on Elvis Presley Boulevard. At the Amoco station, the Defendant said he jumped out of the truck and then stood next to it. He stated that he did not have a gun that night and was not standing guard to make sure Shipp or Ricky Aldridge did not get out of their vehicles. The Defendant testified that he and the other Gangster Disciples got back into the bed of the pickup, and the three vehicles drove to DeSoto Park. The Defendant explained what he thought the group was going to do at the park:

Well, evidently we was coming to discuss the incident about Carlos [Bean], but seeing how Carlos wasn't there and they had some business to take care of, some personal issues on their own count and that was our only ride back home, we had to go for the ride. We had to roll with them until they get through taking care of their business. . . . I was familiar about the incident with [Ricky Aldridge], but I guess they had some personal business about [Shipp] which they didn't never discuss with us. . . . They had never came to a conclusion about a violation yet because [Shipp] was not present the first time. The second time we went we was going to talk about a violation, not saying that a violation was going to be served, because Irvin didn't have to agree to it. But we was going to talk about it, about what they are planning to do about Carlos.

The Defendant stated that once the group got to the "Indian" mound, he heard Becton tell Shipp, "I'm going to take your G." The Defendant explained that Becton meant that "[h]e was taking [Shipp's] membership" from the Gangster Disciples. He stated that he did not see any bats or tire irons at first, but "[n]ext thing I know they coming over the hill with–all I seen was a bat. The other objects was black." The Defendant testified that he did not know most of the other Gangster Disciples in the park. He stated that Ricky Aldridge was served a "two-minute violation" with fists only, but Shipp was served a violation using the various bats and irons. The Defendant denied that he held Shipp as the group beat him and denied that he ever hit Shipp during the beating. Asked whether he ever hit Shipp, he stated, "No, ma'am. I'm not a monster." The Defendant testified that he saw other Gangster Disciples beating Shipp with "something," but he did not attempt to stop them from beating Shipp. He explained:

I couldn't. . . . For one, . . . I don't have any rank. I can't–for one, that's called interrupting the organization structure and I don't have no kind of rank to stop any individual–and plus he was–that was a individual off another count. Me or Irvin couldn't have did nothing about what they were doing to them. That was something personal.

The Defendant testified that he could have walked away, "but it would have been some consequences behind it," such as a beating similar to the ones Ricky Aldridge or Shipp received. He explained that if he walked away, it would have been a breach of trust, which he could be punished for. He stated that after the beating, he returned to the truck, heard two gunshots, and then saw Sykes come out of the Indian mound. The Defendant testified that after everybody got back into the pickup, they left the crime scene and went to Texas Court apartments. The Defendant stated that he did not go to DeSoto Park to punish Shipp or Ricky Aldridge, he did not participate in the beatings, and he did not drive the pickup.

On cross-examination, the Defendant denied seeing Sykes taking Shipp's necklace and ring from him at the Amoco station. Asked why he accompanied the other Gangster Disciples to DeSoto Park, the Defendant responded, "That was my ride. I mean, what I suppose to do, just start walking? . . . I mean, I never even thought–I mean, I never even imagined they were fixing to go to the park

and do what they did. I mean, that thought never came to my head." However, the Defendant admitted that he knew the group was going to serve violations on Ricky Aldridge and Shipp, because "they always go to somewhere that's open and away from everybody else" to serve violations. The Defendant testified that he witnessed the beatings from the top of the mound near the rim and never left that area during the beatings. He stated that he walked around the rim during the beatings "because I didn't want to see what they was doing." The Defendant explained that he did not leave the "Indian" mound and return to the pickup truck "[b]ecause that's called breaking the circle. . . . If–if I would have broke it–I mean, I was scared. I was afraid that night. . . . I mean, I'm around brothers that I . . . never knew before and they start acting like they crazy or losing their mind." The Defendant stated that the beating of Shipp "was terrible." He stated that he walked around the mound with his head down during the beating, looking up occasionally. Following the Defendant's testimony, the Defendant rested his case.

## II. Motion to Suppress

The Defendant argues on appeal that the trial court erred by denying his motion to suppress the pre-trial identification of the Defendant made by Ricky Aldridge and by limiting cross-examination of Ricky Aldridge regarding this identification. First we will address the Defendant's issue regarding the motion to suppress. The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). When the trial court makes findings of fact at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings of fact are "presumptively correct on appeal" and are binding upon this Court unless the evidence in the record preponderates against them. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002); State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); Odom, 928 S.W.2d at 23. The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

A pre-trial identification violates due process when it is so suggestive that it gives rise to "'a very substantial likelihood of irreparable misidentification.'" State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). As such, the focus of the inquiry is the reliability of the identification rather than the suggestive nature of the procedure. State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). Out-of-court and in-court identifications may still be admissible even when pre-trial identification procedures are found to be suggestive. Id. at 400. In determining the effect the procedure had on the reliability of the identification, each case must be considered on its own facts. Simmons, 390 U.S. at 384.

The United States Supreme Court set forth a five-factor analysis for determining whether a

suggestive identification may be admitted into evidence:

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention [at the time of the crime], (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199-200 (1972); see also Philpott, 882 S.W.2d at 400. "The degree of reliability of the identification, as indicated by these factors, should be assessed in light of the suggestiveness of the identification procedure and the totality of the circumstances to determine whether a violation of due process has occurred." Strickland, 885 S.W.2d at 88. Due process is violated where the suggestiveness of the identification process creates the likelihood of misidentification. Neil, 409 U.S. at 198.

At the suppression hearing on July 25, 2001, Ricky Aldridge testified that during the two weeks following Shipp's murder, he talked with Memphis homicide detectives about the beatings and identified the perpetrators of the murder and kidnapping. Ricky Aldridge stated that on September 28, 1997, detectives showed him a photo spread containing six numbered mug shots. He testified that he picked the Defendant from the photo spread as "No. 2," though he did not know the Defendant's name at that time. Ricky Aldridge stated that he recognized the Defendant "[f]rom [Mickens's] house and at the park." He stated that after picking out the Defendant as "No. 2," he was presented with a photograph that matched "No. 2" on the photo spread. Ricky Aldridge testified that he wrote the following note on the back of the "No. 2" photo: "'This is the guy holding Pokey while being beat,' and my signature and the time and the date." He stated that he was shown the same photo spread again on September 29, 1997, and he picked out the Defendant as "No. 2" again. Ricky Aldridge testified that he was presented with another photo that matched "No. 2," and he signed the back of the photo with the notation: "At the park and Tombstone's house." On cross-examination, Ricky Aldridge testified that he was presented with "a stack of pictures," and he picked the Defendant's photo out of this stack. At the conclusion of the suppression hearing, the trial court questioned Ricky Aldridge as follows:

> Q: Okay. Now, on September 28[th], you were shown both of these. Which one of these did you see first?
> A: Seen the cardboard.
> Q: The photo spread with–the cardboard photo spread with the six photographs?
> A: Yes, sir.
> Q: That's what you saw first?
> A: Yes, sir.
> Q: And then after you saw that, you signed this [the single photo]?
> A: Yes, sir.
> Q: Now, you said something about, in cross-examination, about there being a stack of photographs. When was that?

-14-

A:     Up in homicide.

Q:     Was that before you were shown this or after were you were shown this?

A:     That was before, you know, when I first was questioned, they were showing me a whole lot of different pictures of different guys and stuff, and I was just basically picking the ones out who had something to do with it out of pictures they were just showing me in homicide.

Q:     Just large stacks of photographs?

A:     Yes, sir.

Q:     But not set up in photo spreads like this or anything of that sort?

A:     Some was in photo spreads and some was just loose pictures–they were just showing them.

* * *

Q:     And . . . you've pointed to Mr. Heard today in court. In identifying him today in court, as one of the individuals involved in this–

A:     Yes, sir.

Q:     Do you . . . remember him, in looking at him today, as being one of the individuals involved in this?

A:     Yes, sir.

Q:     Is your memory today based on what you remember happening out there that night when your cousin was killed–

A:     Yes, sir.

Q:     –or based on seeing these photographs?

A:     Based on that night.

Following the suppression hearing, the trial court denied the Defendant's motion to suppress. The trial court did not make specific findings of fact in either the transcript of the suppression hearing or its order denying the motion to suppress. Accordingly, the standard of review set forth in Odom, 928 S.W.2d at 23, regarding the trial court's findings of fact will not apply, and our review of the trial court's denial of the motion to suppress in this instance will be de novo. State v. Dougherty, 930 S.W.2d 85, 86 (Tenn. Crim. App. 1996). After thoroughly reviewing the transcript of the suppression hearing, the trial transcript and exhibits, we conclude that the pre-trial identification of the Defendant by Ricky Aldridge was not conducted in an impermissibly suggestive manner that would give rise to a very substantial likelihood of irreparable misidentification. The evidence indicates that Ricky Aldridge first picked the Defendant's photo out of a photo spread and then signed the back of the Defendant's photo on September 28, 1997. Moreover, Ricky Aldridge testified that, on the next day, police officers showed him the same photo spread and he again picked out the Defendant's photo and signed the back of it. Furthermore, Ricky Aldridge stated that he remembered the Defendant as being involved at both the meeting at Mickens's apartment and the beatings at DeSoto Park.

We will now address the Defendant's contention that the trial court erred by limiting cross-

examination of Ricky Aldridge regarding his pre-trial identification of the Defendant. "Generally speaking, a denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (quoting State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). While a defendant has a constitutional right to confront witnesses, the defendant's right to confrontation "does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This Court has explained that "[t]he propriety, scope, manner, and control of the cross-examination of witnesses . . . rests within the sound discretion of the trial court." Dishman, 915 S.W.2d at 463.

During direct examination, Ricky Aldridge identified the Defendant in the courtroom as the person who drove the black pickup and participated in the beating of Shipp. The State inquired as to Ricky Aldridge's pre-trial identifications of the Defendant and introduced the photo spread and the two single photographs of the Defendant as exhibits. Ricky Aldridge testified about the homicide detectives' procedure for photo spreads. The Defendant wanted to cross-examine Ricky Aldridge with his statements from the suppression hearing concerning a "stack of photos" from which he picked out the Defendant's picture. The trial court denied the Defendant's request to impeach the witness using those statements from the suppression hearing because the trial court was "absolutely and positively convinced that this witness was confused after the examination during the suppression hearing." The trial court explained:

> This is an important witness, obviously, the most important witness in the trial. And I'm reluctant to do this, but I'm just–I am absolutely convinced that it would be unfair to the witness to–because of the context in which that question on page 20 was asked, to allow you to, quote, impeach him today with those statements from that transcript. . . . Because I think what he's testified to today has been entirely and completely consistent, entirely and completely with his responses to me, in my voir dire of him at the suppression hearing.

We conclude that the trial court did not abuse its discretion in limiting the cross-examination of Ricky Aldridge in this manner. However, we note that the better trial practice would have been to allow the Defendant an opportunity to impeach Ricky Aldridge with the prior allegedly inconsistent statements from the suppression hearing, thus giving the jury the opportunity to determine if the prior statements were inconsistent and, if so, to determine the effect of such statements on the credibility of the witness. Even if we were to conclude that the trial court erred by limiting the cross-examination, we conclude that such error would be harmless beyond a reasonable doubt. See State v. Sayles, 49 S.W.3d 275, 280 (Tenn. 2001). To determine whether a constitutionally improper denial of a defendant's opportunity to impeach a witness is harmless, the Tennessee Supreme Court explained that:

> [T]he correct inquiry is whether, assuming that the damaging potential of the cross-

examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Sayles, 49 S.W.3d at 280 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684,(1986)). Considering the factors set forth in Sayles, we conclude that the error would be harmless in this case because the evidence overwhelmingly supports the Defendant's convictions, and the trial court otherwise permitted defense counsel to fully cross-examine Ricky Aldridge and all other witnesses at the trial.

### III. Prosecutor's Opening Statement

Next, the Defendant argues that the assistant district attorney improperly commented, to the prejudice of the Defendant, on the state of mind of the victim, Shipp, and a co-defendant, Christopher Smith, during his opening statement. However, the Defendant fails to include any citations to authorities to support his argument in his appellate brief. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also Tenn. R. App. P. 27(a)(7). Therefore, we conclude that the Defendant has waived this issue.

Even if we were to conclude that this issue was not waived, this issue was without merit. The assistant district attorney made the following comments in his opening statement:

And during the course of this party there is a young man there Devon Haywood. And you will hear the witnesses describe him and in their words as sort of slow, retarded, kind of a pitiful figure in that area. People take him in and kind of look out for him, give him things to eat and he's at the party. And at some point Veronica walks out and she sees he is down on his knees being viciously beaten and pistol whipped by a group of Gangster Disciples being led by Christopher Smith who is the assistant governor now, of all south Memphis. Marshall Shipp sees this too and he intervenes. He tries to break up the beating and Christopher Smith looks at him and says, 'this is GD business and that means you better get out.' But Marshall Shipp won't get out. He says he doesn't care whose business it is, you're not going to beat him up. And Christopher Smith, at that point the assistant governor of south Memphis, has had it. He walks up to Marshall Shipp and says, 'You just signed your death warrant.'"

We note that the assistant district attorney's comments during his opening statement regarding what transpired at the L & B Lounge on August 29, 1997, was an accurate account of Veronica Johnson's testimony at trial. Johnson testified that Christopher Smith told Shipp that he was interfering in

Gangster Disciple business and that he "just signed his death certificate." Furthermore, when the Defendant objected to these comments by the assistant district attorney, the trial court found that the statements constituted excited utterances. We conclude that the above comments that were included in the opening statement by the assistant district attorney were appropriate based upon the evidence presented at trial and, therefore, did not prejudice the Defendant.

## IV. Hearsay Statement of the Victim

The Defendant also argues that the trial court erred by allowing Grafton to testify as to the victim's state of mind concerning the Gangster Disciples about a month prior to his murder. Grafton testified that she had a "social conversation" with Shipp about a month prior to his murder . She stated that Shipp told her that "he was tired of the lifestyle and the environment that he was in" and that "[h]e wanted to get out" of the Gangster Disciples. The admissibility of evidence is a matter within the discretion of the trial court and will be overturned only when there is an abuse of that discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1993). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. James, 81 S.W.3d at 760 (quoting State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002)).

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A hearsay statement is inadmissible at trial unless the statement falls under a hearsay exception set forth in Tennessee Rules of Evidence 803 or 804. See Tenn. R. Evid. 802. We conclude that Grafton's statement was hearsay, because it was offered to prove the truth of the matter asserted: that Shipp was tired of the gangster lifestyle and wanted to get out of the gang.

However, Tennessee Rule of Evidence 803(3) provides a hearsay exception for a statement of the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health). . . ." This exception does not include "a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Tenn. R. Evid. 803(3). The Advisory Commission Comments of Tennessee Rule of Evidence 803(3) explains that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." The Defendant admits that the testimony "does demonstrate a state of mind of the declarant," but argues that the statement is not relevant given the lapse of time from when the statement was made to the victim's death. The Defendant further argues that the testimony was highly prejudicial and that establishing the state of mind of the victim "did not provide any assistance to the jury in determining the actions or state of mind of the Defendant." The trial court allowed the testimony, explaining:

I think given the sort of regularity of these incidents, this statement made on one day,
two weeks later one incident, a week after that a second incident, a week after he's

-18-

killed. That is all, I think, very consistent with his state of mind and sort of underscores his overall frame of mind . . . . Obviously, a lot of testimony comes in and goes to the events leading up to the death and then the events surrounding the death and everything that comes in doesn't necessarily directly tie in [the Defendant]. And so all of the larger picture that is being painted in order to establish the death. And so, obviously, there is no necessity that every single statement include [the Defendant]. . . .

The State argues that the statement was relevant to explaining the motive for the attack on the victim, because its theory was that the beating of Shipp was a form of punishment for his actions against the Gangster Disciples. We disagree with the State's argument because the state of mind hearsay exception may not be used to prove some third party's conduct. Accordingly, we conclude that this testimony was not relevant to prove the Gangster Disciples' motive for the attack on Shipp. However, we conclude that Grafton's testimony regarding Shipp's state of mind was relevant to explain why Shipp acted the way he did toward other gang members on August 29, 1997, and September 11, 1997. Furthermore, we agree with the trial court that the statement was made sufficiently close in time to the August 29, 1997, incident to be relevant. Accordingly, we conclude that the trial court did not abuse its discretion by admitting this testimony into evidence.

## V. Jury Instructions

Next, the Defendant argues that the trial court erred by denying the Defendant's request for a special jury instruction addressing the theories of duress and mere presence. "[A] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of the case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). Furthermore, the trial court must describe and define all of the elements of each offense. State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). When jury instructions are full, fair, and accurate statements of the law, a trial court is not required to provide special instructions. State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984); State v. Chestnut, 643 S.W.2d 343, 352 (Tenn. Crim. App. 1982). It is not error for a trial court to deny a request for special instructions when the court's instructions on a matter are proper. State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998).

First, we will address the Defendant's contention that the trial court should have granted his request for an instruction on mere presence. The Defendant admits that the trial court supplemented the criminal responsibility instruction to include a statement regarding mere presence. The trial court included the following jury instruction:

Criminal Responsibility for Conduct of Another

The defendant is criminally responsible as a party to an offense if the offense was committed by the defendant's own conduct, by the conduct of another for which

the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

Mere presence at the scene of the crime, however, would not in and of itself establish that the defendant committed the crimes charged. There must be some evidence, at least circumstantial, that he participated in the crimes.

The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

The Defendant argues that "by placing the instruction in the middle of another instruction, the full import of the definition was diminished." We disagree. We conclude that the trial court gave a full, fair and accurate statement of the law regarding criminal responsibility for the conduct of another and that the trial court properly included the "mere presence" instruction in this instruction. Because the criminal responsibility instruction was a complete and accurate statement of the law, the trial court did not err by denying the Defendant's request for a separate "mere presence" instruction. Furthermore, we must presume that the jury properly followed the trial court's instructions absent clear and convincing proof to the contrary. See State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990); State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). The Defendant has failed to present any evidence that the jury in this case failed to follow this particular instruction.

The Defendant also argues that the trial court erred by denying his request that the jury be instructed as to the defense of duress. Tennessee Code Annotated section 39-11-504 (1997) provides that:

(a) Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

(b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

The Defendant contends that according to his testimony at trial, he was not free to retreat from the

beatings taking place in DeSoto Park because, if had simply walked away from the beatings, he would have been "in violation" himself and may have received a beating from other Gangster Disciples. Accordingly, the Defendant argues that the trial court erred by not including a jury instruction on the defense of duress. The trial court explained why it did not include a special jury instruction on duress:

> The reluctance I have in charging duress is that it states that the defendant is threatened–duress is a defense if the defendant is threatened with harm which is present, imminent, impending and of such a nature as to induce a well granted apprehension of death or serious bodily injury if the act is not done. Threatened harm is continuous throughout the time the act is being committed. And the testimony of the defendant suggests that no act was done. And that's my problem with charging duress. . . . And I just don't think that there's any testimony that he was under duress to do anything because he doesn't admit in his testimony to having done anything, to having committed an act. And so, I just don't think it's appropriate. Now, I guess you could argue that he was under duress to not walk away or something, but that's not what is contemplated in this charge. . . . I think this charge contemplates committing–they talked about it in each element, committing the act. . . . I just don't think that the proof rises to the level that would warrant charging duress.

We agree with the trial court that the evidence introduced at trial does not support a special jury instruction on duress. Neither the Defendant nor the State introduced any testimony that the Defendant was under duress during the beatings at DeSoto Park. To the contrary, the evidence indicates that the Defendant voluntarily accompanied his fellow Gangster Disciples to the "Indian" mound where the beatings took place, and the Defendant was not "threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done." Tenn. Code Ann. § 39-11-504(a). Indeed, the Defendant testified that he did not participate in the beatings, rather he just watched the assault on Shipp. Accordingly, we conclude that the trial court did not err by denying the Defendant's request for a special jury instruction on duress.

## VI. Sufficiency of the Evidence

Finally, the Defendant argues that the evidence presented at trial was insufficient for a rational trier of fact to find the Defendant guilty beyond a reasonable doubt. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of the following offenses: (1) premeditated first degree murder of Marshall Shipp; (2) first degree murder of Marshall Shipp during the perpetration of a kidnapping; (3) especially aggravated kidnapping of Marshall Shipp; and (4) especially aggravated kidnapping of Ricky Aldridge. After thoroughly reviewing the record in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.

The jury convicted the Defendant of both premeditated first degree murder and felony murder, and the trial court merged those convictions. Therefore, we will examine the record to determine whether sufficient evidence exists to support the premeditated first degree murder conviction and the felony murder conviction. Premeditated first degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (1997). Premeditation is an act done after "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The State's evidence established that the Defendant was present at the meeting at Mickens's apartment where Gangster Disciples were debating what punishments Shipp and Ricky Aldridge should receive. The evidence further established that the Defendant drove a black pickup which carried several other Gangster Disciples and led a three vehicle caravan to DeSoto Park. Once the Gangster Disciples arrived at the "Indian" mound at the park, the State's evidence established that the Defendant and other Gangster Disciples used bats and crowbars to beat Shipp. Ricky Aldridge testified that when Shipp started to fight back, the Defendant held Shipp from behind so other Gangster Disciples could beat him with their weapons. Timothy Aldridge testified that he saw the Defendant beating Shipp with "something" in his hand. The Defendant testified that he was at the "Indian" mound when the beating occurred, but he did not participate and just watched. The evidence introduced at trial overwhelmingly indicates that the beating and shooting of Shipp was a calculated act by the group of Gangster Disciples, which included the Defendant, done after the exercise of reflection and judgment. The evidence established that the Gangster Disciples intended to kill Shipp at DeSoto Park by beating him with deadly weapons and shooting him because he was a "rebellious brother" who disrespected ranking Gangster Disciples and fought with fellow gang members. Accordingly, we conclude that the evidence is sufficient to establish the Defendant's guilt of the premeditated first degree murder of the victim beyond a reasonable doubt.

Felony first degree murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). The Defendant was convicted of first degree murder of Shipp during the perpetration of a kidnapping. If we conclude that the evidence is sufficient to establish the Defendant's guilt concerning the especially aggravated kidnapping of Shipp, then the evidence would likewise be sufficient to establish the Defendant's guilt of felony first degree murder beyond a reasonable doubt.

Especially aggravated kidnapping is the knowing, unlawful removal or confinement of another "so as to interfere substantially with the other's liberty," Tenn. Code Ann. 39-13-302(a) (1997), where such removal or confinement is accomplished with a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. 39-13-305(a)(1) and (4) (1997). The Defendant was convicted for the especially aggravated kinappings of Shipp and Ricky Aldridge. The State's evidence established that Shipp and Ricky Aldridge were forced to attend the Gangster Disciples meeting at Mickens's apartment. The evidence established that Gangster Disciples armed with handguns put Shipp and Ricky Aldridge under "Gangster Disciple arrest" and escorted them to the meeting, where the gang members debated what punishments the two should receive. Following this meeting, the evidence indicated that Shipp and Ricky Aldridge were escorted by armed Gangster Disciples to the cars outside. Ricky Aldridge testified that once he and Shipp were inside the cars, they were not allowed to exit the vehicles because they were under "GD arrest." The State's evidence also established that the armed Gangster Disciples drove Shipp and Ricky Aldridge to the remote DeSoto Park and forced them into the middle of an "Indian" mound. In addition, the evidence showed that the Gangster Disciples severely beat Shipp with bats and tire irons and then shot him, which led to his death two days later. The evidence established that Ricky Aldridge was beaten with fists in the "Indian" mound. Further, Ricky Aldridge testified that the Defendant participated in the meeting at Mickens's apartment, drove the lead vehicle in the caravan to DeSoto Park, and actively participated in the beating of Shipp by holding him while others beat him with bats and tire irons. Accordingly, we conclude that the evidence is sufficient to establish the Defendant's guilt of the especially aggravated kidnappings of Shipp and Ricky Aldridge beyond a reasonable doubt, and, by extension, we conclude that the evidence is sufficient to support the jury's verdict for the felony first degree murder of Shipp.

## VII. Conclusion

In accordance with the forgoing authorities and reasoning, we AFFIRM the trial court's judgments.

_____

ROBERT W. WEDEMEYER, JUDGE